# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 12-51038

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 21, 2014

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

RICKEY D. BENNS,

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas

Before OWEN, SOUTHWICK, and GRAVES, Circuit Judges.

JAMES E. GRAVES, Jr., Circuit Judge:

Rickey Benns appeals his sentence and restitution order following his conviction for making false statements relating to a credit application. Because we agree that the district court erred in calculating the loss amount attributable to him under the Sentencing Guidelines and in awarding restitution based on relevant conduct, we VACATE Benns' sentence and restitution order and REMAND the case to the district court for resentencing.

## BACKGROUND

On March 14, 2012, Rickey Benns was named in a one-count indictment charging him with making false statements relating to a credit application, in violation of 18 U.S.C. § 1014. The indictment alleged that Benns "knowingly

No. 12-51038

made a material false statement for the purpose of influencing the action of Countrywide Bank, a bank then insured by the Federal Deposit Insurance Corporation, in connection with an application for loan modification." Specifically, the indictment alleged that Benns "forged the signatures of borrowers on an application for modification to a loan related to a property located at 1301 Red Deer Way, Arlington, Texas, and created and submitted a false pay stub in order to deceive Countrywide Bank into believing that the borrowers were more credit-worthy than was actually the case."

Benns pleaded guilty to the charge in the indictment without a plea agreement. In entering his plea, Benns accepted the accuracy of a factual resume prepared by the government. The resume stated that Benns acquired an interest in a property located at 1301 Red Deer Way from B.A. and M.A., although B.A. and M.A. continued to hold the mortgage loan; that Benns forged the signatures of B.A. and M.A. on an application to modify the mortgage loan; and that Benns created and submitted a fake pay stub to support the application. The factual resume also recited the penalties that could be imposed by the court for a violation of 18 U.S.C. § 1014, including: "restitution to victims or to the community, which may be mandatory under the law, and which Defendant agrees may include restitution arising from all relevant conduct, not limited to that arising from the offense of conviction alone."

The presentence report ("PSR") described an ongoing scheme by Benns to target distressed properties (*i.e.* properties with little or no equity in them) that had been on the market for at least ninety days. Benns would invite the homeowner to deed the property to him without receiving any payment, and would agree to take over the mortgage payments for the property and attempt to sell it. Benns would then purport to sell the homes to rent-to-own buyers, collecting down payments and monthly mortgage payments from the buyers. However, Benns frequently collected money from the buyers but did not use it

No. 12-51038

to make the monthly mortgage payments. The PSR listed ten properties acquired by Benns that ultimately were foreclosed after mortgage payments were not made.[1] According to Benns' statements in an interview with law enforcement officers, "he did not intend for this to happen. He stated he was trying to keep up with too many properties and did not have a good tracking system."

The property located at 1301 Red Deer Way, for which Benns submitted the fraudulent loan modification application, was one of the properties acquired by Benns. Benns admitted that he submitted the fraudulent application in an attempt to save the home from foreclosure. Nevertheless, the property was eventually foreclosed, resulting in a loss of $54,906.59 to the Department of Housing and Urban Development ("HUD").[2] The other nine foreclosures resulted in total losses of $489,695.83 to the mortgage holders and/or guarantors of the properties. As the PSR explained, "[t]he loss amount from the mortgage companies is the outstanding principal balance at the time of foreclosure, plus any out-of-pocket costs related to the foreclosure, minus the resell value of the property."

Based on these losses, the PSR held Benns accountable for a total loss amount of $544,602.42. The base level for Benns' offense of conviction is 7. U.S.S.G. § 2B1.1(a)(1). With his criminal history category of I, this produces an

---

[1] Although the PSR provided a factual background for four of these properties, the other six were merely named in "a list of properties that were foreclosed after Benns failed to make the mortgage payments." For example: "3404 Portico Lane, Dallas, Texas, seller: Cassandra Carey, rent-to-own buyer: Shamondria Wheatley. According to Fannie Mae, due to the foreclosure, they sustained a loss of $30,523.94." The PSR also stated that Benns "committed this same scheme" with four additional properties, but did not provide loss amounts; these properties do not figure into the total loss amount.

[2] The PSR characterized both Countrywide and Bank of America as the holder of the mortgage on this property, yet stated that HUD suffered the loss. Although not explicitly stated, it appears that Bank of America acquired the mortgage from Countrywide and HUD guaranteed it.

advisory guidelines range of zero to six months of imprisonment. However, the loss amount of $544,602.42 increases the offense level fourteen points, to twenty-one. U.S.S.G. § 2B1.1(b)(1)(H). This results in a guidelines range of thirty-seven to forty-six months of imprisonment.

Benns objected to the inclusion of losses relating to the nine additional properties. Benns argued that "[n]o illegal conduct [was] involved," and that "these additional losses are not causally related to the illegal conduct charged in the Indictment." Benns further argued that the additional losses are "not relevant conduct under the Sentencing Guidelines," and that he "did not receive proper notice as to how those amounts were calculated." Finally, Benns objected to the additional loss amounts "to the extent they include costs and/or expenses that are not legally attributable to [him] as actual or intended loss under the Sentencing Guidelines and case law and to the extent that any fine is determined by the total amount of loss."

The probation officer rejected Benns' arguments with the following explanation:

> Pursuant to USSG § 1B1.3(a)(2), the base offense level shall be determined on the basis of all acts and omissions described in subdivisions (1)(A) and (1)(B) that were part of the same course of conduct or common scheme or plan as the offense of conviction. Pursuant to USSG § 1B1.3, comment. [n.9], for two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*. In this case, the only difference between the offense committed in the Indictment and the other losses caused by this defendant, is the defendant tried to cover up his criminal activity by forging documents. Otherwise, all other activity is the same. Benns was committing criminal activity when it came to all the homes listed in the presentence report. He committed fraud when he had the original homeowners believing they had sold their homes. He committed fraud when he collected down payments and mortgage payments from the rent-to-own buyers, but did not make

the mortgage payments. Money and documents that were sent to Benns were sent through the mail. Some of the mortgage payments were automatically deducted from checking accounts. The Federal Government could have filed mail fraud, wire fraud, or other similar charges. The Federal Government could have also filed *Equity Skimming*, in violation of Title 12, U.S.C. § 1709-2. It is believed the additional properties to which Rickey Benns is being held accountable is relevant conduct to the Indictment.

At the sentencing hearing, Benns' counsel explained that Benns did not "contest anything in the PSR itself as far as the way it's reported," but maintained that the losses from the additional properties should not count as relevant conduct. The government argued that "the $540,000 comes from all the properties that were foreclosed because of the defendant's keeping the money and not making the payments like he had planned to do that he told the buyers and the sellers that he planned to do." The district court overruled Benns' objection, stating, with no further explanation: "I believe the probation department's position is correct." After Benns received an offense level reduction for acceptance of responsibility, his guidelines range became twenty-seven to thirty-three months imprisonment. The district court sentenced Benns to twenty-seven months of imprisonment, followed by five years of supervised release. The district court also ordered restitution in the amount of $544,602.42, to be paid to HUD, the Department of Veterans Affairs ("VA"), the Federal National Mortgage Association ("Fannie Mae"), PMI Mortgage Insurance Company, and Aurora Bank FSB. Benns now appeals, challenging the district court's calculated loss amount and the award of restitution.

## DISCUSSION

### I.   LOSS AMOUNT

A defendant convicted of an offense involving fraud or deceit is sentenced based on the amount of loss attributable to his conduct. *See* U.S.S.G. § 2B1.1(b). In addition to losses attributable to the acts underlying the offense of conviction,

No. 12-51038

the loss amount may include losses attributable to other acts that constitute "relevant conduct" as defined in the Sentencing Guidelines. *See* U.S.S.G. § 1B1.3(a)(2).[3] Relevant conduct includes "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." *Id.*

We note at the outset that there is no evidence in the PSR, or elsewhere in the record, establishing that Benns' offense of conviction – submitting a forged loan modification application and fake pay stub to Countrywide Bank – caused any loss at all. The PSR does not even state whether the application was granted, and it includes no loss suffered by Countrywide. Accordingly, Benns' challenge to the loss amount focuses entirely on acts found to be relevant conduct – specifically, his dealings with the home buyers and sellers.

A.    **Criminal conduct**

On appeal, Benns does not dispute the facts recited in the PSR, including the general description of his house-flipping scheme. However, Benns maintains that his dealings with the home buyers and sellers were not fraudulent or otherwise criminal. Only conduct that is criminal may be used as "relevant conduct" to determine a defendant's offense level. *United States v. Peterson*, 101 F.3d 375, 385 (5th Cir. 1996) (citations omitted). Although Benns concedes that his business practices may have been unwise, he argues that they were fraudulent only if he assumed the mortgages with the intent to not make the payments. Benns contends that although the PSR "reflected [that he] had been unsuccessful in his house-flipping endeavors, . . . it did not include sufficient facts to back up the bald conclusion that his entering into house flipping agreements had been criminally fraudulent at the outset." Accordingly, Benns

---

[3] Fraud and related offenses sentenced under § 2B1.1 are grouped with respect to multiple counts. *See* § 3D1.2(d). Accordingly, relevant conduct for such offenses is determined per the method set forth in § 1B1.3(a)(2).

6

argues that the loss amounts resulting from the home foreclosures are not properly attributable to him as "relevant conduct."

The PSR initially included the total amount of loss from the ten foreclosed properties as relevant conduct without even explaining which crimes Benns committed in causing the losses.  In responding to Benns' objections, the probation officer suggested that the government could have filed charges of "mail fraud, wire fraud, or other similar charges," or charges of equity skimming.  At the sentencing hearing, the district court made no factual findings and did not discuss which crimes Benns had committed.

To prove mail or wire fraud, the government must prove "a scheme to defraud, the use of the mail or wire communications, and a specific intent to defraud." *United States v. McMillan*, 600 F.3d 434, 450 (5th Cir. 2010) (citation omitted).  The crime of "equity skimming" applies to a defendant who,

> with intent to defraud, willfully engages in a pattern or practice of--
>
> (1) purchasing one- to four-family dwellings (including condominiums and cooperatives) which are subject to a loan in default at time of purchase or in default within one year subsequent to the purchase and the loan is secured by a mortgage or deed of trust insured or held by the Secretary of Housing and Urban Development or guaranteed by the Department of Veterans Affairs, or the loan is made by the Department of Veterans Affairs,
>
> (2) failing to make payments under the mortgage or deed of trust as the payments become due, regardless of whether the purchaser is obligated on the loan, and
>
> (3) applying or authorizing the application of rents from such dwellings for his own use.

12 U.S.C. § 1709-2.  The most obvious common factor in these offenses is the fraudulent intent.

As Benns correctly notes, he did not necessarily commit any crimes in failing to make mortgage payments on the homes he acquired.  Benns could have entered into his house-flipping scheme fully intending to fulfill his promises to

the buyers and sellers, yet found himself unable to do so due to some combination of misfortune and ineptitude. On the other hand, if he intended to defraud the buyers and/or sellers at the time he induced them to enter into transactions with him, he may have committed numerous crimes. Because Benns specifically objected that his dealings with the buyers and sellers were not criminal, the district court was aware of the need to establish that Benns had in fact committed criminal acts that could properly be considered relevant conduct. However, neither the district court nor the probation officer made any attempt to identify evidence of Benns' conduct or explain how such conduct satisfied the elements of some criminal offense.

The probation officer concluded that Benns defrauded all of the home buyers and sellers involved without any discussion of the facts on which this conclusion was based. As noted above, there are literally no facts at all in the PSR concerning Benns' interactions with the buyers and sellers of six properties for which he was held accountable. As to the other four properties, the facts in the PSR do not unambiguously indicate fraud; for example, Benns undisputedly made at least some mortgage payments on the properties he acquired. Finally, the probation officer identified no facts showing that Benns used the mail or wire communications to further his alleged fraud as to each property, and made no attempt to explain how the elements of 12 U.S.C. § 1709-2 were satisfied as to all ten properties.

Of course, the ultimate responsibility for determining relevant conduct and calculating the guidelines range lies with the district court, not the probation officer. Because the district court neither made factual findings concerning Benns' conduct nor explained which statutes Benns violated, we are unable to determine whether Benns' dealings with the home buyers and sellers were criminal. Accordingly, we remand the case to the district court for resentencing, to include specific findings as to the relevant conduct for which Benns is being

punished. Although we decline to adopt an absolute rule, we emphasize that, particularly when a defendant is being held accountable at sentencing for uncharged conduct and has objected that the conduct is not criminal, meaningful appellate review may be impossible without explicit findings by the district court.[4]

## B.     Common scheme or plan

As noted above, relevant conduct includes "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). The probation officer's response to Benns' objections reveals that she considered Benns' dealings with the home buyers and sellers to be part of the same "common scheme or plan" as his offense of conviction, making false statements relating to a credit application. The district court made no findings on this issue.

"For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." U.S.S.G. § 1B1.3, cmt. 9(A). On remand, the district court should explain how any relevant conduct attributed to Benns is "part of the

---

[4] The Sixth Circuit's comments in an analogous case involving relevant conduct are instructive:

> The district court did not state what criminal statute Catchings violated with regard to his use of the U.S. Investments & Construction cards. We find this omission problematic in this case for two reasons. First, Catchings contested whether his conduct related to these cards was criminal. Therefore, the district court was aware of the need to make an explicit finding of criminality with regard to that conduct. Second, although relevant conduct can include uncharged conduct, the fact that the U.S. Investments & Construction cards were not listed in any charge against Catchings makes the need for an express statement of what statute this conduct violated even greater. In comparison, the other cards that were included in the relevant-conduct section of the PSR were listed in the indictments.

*United States v. Catchings*, 708 F.3d 710, 721 n.8 (6th Cir. 2013).

same course of conduct or common scheme or plan as the offense of conviction." Although we do not decide whether Benns' dealings with the home buyers and sellers are properly considered relevant conduct, we caution that the concept of a "common scheme of plan," while expansive, "cannot be too broad, otherwise almost any uncharged criminal activity can be painted as similar in at least one respect to the charged criminal conduct." *United States v. Ortiz*, 613 F.3d 550, 557 (5th Cir. 2010) (quotation omitted).  We note that Benns' offense of conviction, defrauding Countrywide Bank in a loan modification application, is not connected to his dealings with the home buyers and sellers by common victims, common accomplices, or a similar *modus operandi*.  Moreover, although Benns' offense of conviction and alleged relevant conduct may be connected in some sense by a common purpose, circuit precedent has rejected excessively broad or general "purposes." *See, e.g.*, *United States v. Wall*, 180 F.3d 641, 645 (5th Cir. 1999) (finding a "common general purpose of importing marijuana for distribution in the United States," without more, to be insufficient to establish a "common scheme or plan"); *United States v. Rhine*, 583 F.3d 878, 886 (5th Cir. 2009) ("[T]he only common purpose linking the two offenses is Rhine's motivation to profit from the distribution of crack cocaine, which—like the marijuana importation in *Wall*—is by itself insufficient to connect the offenses as separate parts of a common scheme or plan.").

### C.    Causation of loss

Finally, if Benns is to be held accountable through relevant conduct for losses to mortgage lenders caused by default and foreclosure, his criminal acts must have actually caused these losses. *See, e.g.*, *United States v. Randall*, 157 F.3d 328, 331 (5th Cir. 1998) ("Before a court may attribute losses to a defendant's fraudulent conduct, there must be some factual basis for the conclusion that those losses were the result of fraud.") (quotation and brackets omitted).  Although it is certainly possible that Benns' allegedly fraudulent

conduct caused the foreclosure losses, this is not obvious from the record. The PSR explains that Benns targeted owners of distressed homes who may have been facing imminent foreclosure, which suggests that Benns' actions did not necessarily cause or even exacerbate the lenders' losses. Of course, causation is a factual question that we do not purport to answer; we merely emphasize the need for the district court to address causation in its findings.[5]

## II.    RESTITUTION

Benns argues that the district court erred in awarding restitution based on losses caused by relevant conduct. Because Benns did not object to the restitution award before the district court, we review for plain error. To demonstrate plain error, an appellant must show an error that is clear and obvious and that affected his substantial rights. *Puckett v. United States*, 556 U.S. 129, 135 (2009). If the appellant makes such a showing, this court has the discretion to remedy the error, but should do so only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.*

"The general rule is that a district court can award restitution to victims of the offense, but the restitution award can encompass only those losses that resulted directly from the offense for which the defendant was convicted." *United States v. Maturin*, 488 F.3d 657, 660-61 (5th Cir. 2007). However, "the court may also order, if agreed to by the parties in a plea agreement, restitution to persons other than the victim of the offense." 18 U.S.C. § 3663(a)(1)(A); *see Maturin*, 488 F.3d at 661.

---

[5] We also question why, in calculating the loss amount and awarding restitution, the district court considered only the losses suffered by mortgage lenders and guarantors, who were at best indirect victims of Benns' alleged fraud on the home buyers and sellers, and ignored the losses that may have been suffered by the buyers and sellers themselves. The PSR itself lists at least four buyers (Jeff Armendinger, Leon Hodge, Elfira Item, and Nancy Thompson) who made payments on homes that were ultimately foreclosed, as well as other victims who suffered losses that are perhaps less quantifiable.

No. 12-51038

We agree that the district court erred by awarding restitution based on relevant conduct that went beyond Benns' offense of conviction. Moreover, an award of restitution based on losses not resulting from the offense of conviction is an error that is clear and obvious. *See United States v. Inman*, 411 F.3d 591, 595 (5th Cir. 2005). The error resulted in an award of more than half a million dollars against Benns. "When a defendant is ordered to pay restitution in an amount greater than the loss caused, the error affects substantial rights as well as the fairness and integrity of the judicial proceeding." *United States v. Austin*, 479 F.3d 363, 373 (5th Cir. 2007).

The government argues that Benns cannot show any error that affected his substantial rights because he agreed – in the factual resume supporting his guilty plea – that an award of restitution "may include restitution arising from all relevant conduct, not limited to that arising from the offense of conviction alone." However, 18 U.S.C. § 3663(a)(1)(A) expressly states that expanded restitution must be "agreed to by the parties in a plea agreement," and there was no plea agreement in this case. Accordingly, we vacate the district court's award of restitution.

## CONCLUSION

Benns' sentence and restitution award are VACATED, and the case is REMANDED to the district court for resentencing consistent with this opinion.